AO 106A (08/18) Application for a Warrant by Telephone or Other Reliable Electronic Means

# UNITED STATES DISTRICT COURT
### for the
### Southern District of Ohio

| | | |
|---|---|---|
| In the Matter of the Search of | ) | |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) | Case No. 3:21-MJ-305 |
| RESIDENCE LOCATED AT 10 DEWEY DRIVE, KETTERING, OH 45420 | ) ) ) | |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

SEE ATTACHMENT A

located in the _____Southern_____ District of _____Ohio_____, there is now concealed *(identify the person or describe the property to be seized):*

SEE ATTACHMENT B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

- ☑ evidence of a crime;
- ☐ contraband, fruits of crime, or other items illegally possessed;
- ☑ property designed for use, intended for use, or used in committing a crime;
- ☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| SEE ATTACHMENT C | SEE ATTACHMENT C |

The application is based on these facts:
SEE ATTACHED AFFIDAVIT

- ☐ Continued on the attached sheet.
- ☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

TFO Kyle G. Metz, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____Telephone_____ *(specify reliable electronic means).*

Date: ___08/11/2021___

City and state: Dayton, Ohio

_____
Peter B. Silvain, Jr.
United States Magistrate Judge

## ATTACHMENT A

*Property to be searched*

This warrant applies to information associated with the location known as **10 Dewey Drive, Kettering, OH, 45420**. The residence is a single-story, multi-family home, and has a maroon partially covered roof with maroon shutters surrounding the windows. The multi-family home has two units, one in the front and one in the rear. The address for the front residence is 10 Dewey Drive, while the address for the rear residence is 12 Dewey Drive. The multi-family home, which includes both the front and rear units, has light yellow-colored siding and the number "10" appears on the right front of the home above the number "12." There is a screened-in porch on the right side of the home with a mailbox with the number "10" on it. A door inside the screened-in porch of the multi-family home is marked with the number "10" as well. This warrant only seeks to search the front unit of the multi-family home with the address of 10 Dewey Drive and does not seek to search the back unit with the address of 12 Dewey Drive.



## ATTACHMENT B

*Property to be seized*

1.     The items to be seized are fruits, evidence, information, contraband, or instrumentalities, in whatever form and however stored, relating to violations of 18 U.S.C. §§ 111(a), 2 (Assaulting, Resisting, or Impeding, Certain Officers (Aiding and Abetting)), 18 U.S.C. § 1512(c)(2) (Obstruction of an Official Proceeding); 18 U.S.C. § 231(a)(3) (Civil Disorder); and 40 U.S.C. §§ 5104(e)(2)(D) and (F) (Disorderly Conduct and Physical Violence on Capitol Grounds) (the "Target Offenses") that have been committed by David Mehaffie ("the Subject") and other identified and unidentified persons, as described in the search warrant affidavit; including, but not limited to:

     a.  Evidence concerning planning to unlawfully enter the U.S. Capitol, including any maps or diagrams of the building or its internal offices;

     b.  Evidence concerning unlawful entry into the U.S. Capitol, including any property of the U.S. Capitol;

     c.  Evidence concerning awareness of the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

     d.  Evidence concerning efforts to disrupt the official proceeding that was to take place at Congress on January 6, 2021, i.e., the certification process of the 2020 Presidential Election;

     e.  Evidence relating to a conspiracy to illegally enter and/or occupy the U.S. Capitol Building on or about January 6, 2021;

     f.  Evidence concerning the breach and unlawful entry of the United States Capitol, and any conspiracy or plan to do so, on January 6, 2021;

     g.  Evidence concerning the riot and/or civil disorder at the United States Capitol on January 6, 2021;

h.  Evidence concerning the assaults of federal officers/agents and efforts to impede such federal officers/agents in the performance of their duties the United States Capitol on January 6, 2021;

i.  Evidence concerning damage to, or theft of, property at the United States Capitol on January 6, 2021;

j.  Evidence of any conspiracy, planning, or preparation to commit those offenses;

k.  Evidence concerning efforts after the fact to conceal evidence of those offenses, or to flee prosecution for the same;

l.  Evidence concerning materials, devices, or tools that were used to unlawfully enter the U.S. Capitol by deceit or by force, including weapons and elements used to breach the building or to counter efforts by law-enforcement, such as pepper spray or smoke grenades;

m.  Evidence of communication devices, including speakers, closed circuit radios or walkie-talkies, that could have been used by co-conspirators to communicate during the unlawful entry into the U.S. Capitol;

n.  Evidence of the state of mind of the subject and/or other co-conspirators, *e.g.*, intent, absence of mistake, or evidence indicating preparation or planning, or knowledge and experience, related to the criminal activity under investigation; and

o.  Evidence concerning the identity of persons who either (i) collaborated, conspired, or assisted (knowingly or unknowingly) the commission of the criminal activity under investigation; or (ii) communicated with the unlawful actors about matters relating to the criminal activity under investigation, including records that help reveal their whereabouts.

2.      Records and information that constitute evidence of identity, including but not limited to:

    a.   clothing or items worn or carried by the subject, to include a grey zip-up hoodie, a black or dark grey long-sleeve Cabela's ¼ zip shirt, blue ear protection and a blue neck gaiter;

    b.   clothing and other articles that reflect evidence of having participated in the unlawful activity at the U.S. Capitol, including evidence of pepper spray or other non-lethal crowd control remnants;

3.      Records and information—including but not limited to documents, communications, emails, online postings, photographs, videos, calendars, itineraries, receipts, and financial statements—relating to:

    a.   Any records and/or evidence revealing the Subject's presence at the January 6, 2021, riot;

    b.   Any physical records, such as receipts for travel, which may serve to prove evidence of travel of to or from Washington D.C. from December of 2020 through January of 2021;

    c.   The Subject's motive and intent for traveling to the U.S. Capitol on or about January 6, 2021; and

    d.   The Subject's activities in and around Washington, D.C., specifically the U.S. Capitol, on or about January 6, 2021.

4.      For any cellular telephones used by the Subject which is (or are) capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities as described in the search warrant affidavit and above, hereinafter the "Device(s)":

    a.   evidence of who used, owned, or controlled the Device(s) at the time the things described in this warrant were created, edited, or deleted, such as logs, registry

entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, chat, instant messaging logs, photographs, and correspondence;

b. evidence of software, or the lack thereof, that would allow others to control the Device(s), such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c. evidence of the attachment to the Device(s) of other storage devices or similar containers for electronic evidence;

d. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the Device(s);

e. evidence of the times the Device(s) was used;

f. passwords, encryption keys, and other access devices that may be necessary to access the Device(s);

g. documentation and manuals that may be necessary to access the Device(s) or to conduct a forensic examination of the Device(s);

h. records of or information about Internet Protocol addresses used by the Device(s);

i. records of or information about the Device(s)'s Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

j. Routers, modems, and network equipment used to connect computers to the Internet.

During the execution of the search of the PREMISES described in Attachment A, law enforcement personnel are also specifically authorized to obtain from David Mehaffie (but not any other individuals present at the PREMISES at the time of execution of the warrant) the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint, facial characteristics, or iris display) necessary to unlock any Device(s) requiring such biometric access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that

the aforementioned person(s)' physical biometric characteristics will unlock the Device(s), to include pressing fingers or thumbs against and/or putting a face before the sensor, or any other security feature requiring biometric recognition of:

    (a)    any of the Device(s) found at the PREMISES,

    (b)    where the Device(s) are limited to those which are capable of containing and reasonably could contain fruits, evidence, information, contraband, or instrumentalities of the offense(s) as described in the search warrant affidavit and warrant attachments,

for the purpose of attempting to unlock the Device(s)'s security features in order to search the contents as authorized by this warrant.

While attempting to unlock the device by use of the compelled display of biometric characteristics pursuant to this warrant, law enforcement is not authorized to demand that the aforementioned person(s) state or otherwise provide the password or identify the specific biometric characteristics (including the unique finger(s) or other physical features), that may be used to unlock or access the Device(s). Nor does the warrant authorize law enforcement to use the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel the aforementioned person(s) to state or otherwise provide that information. However, the voluntary disclosure of such information by the aforementioned person(s) is permitted. To avoid confusion on that point, if agents in executing the warrant ask any of the aforementioned person(s) for the password to any Device(s), or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks any Device(s), the agents will not state or otherwise imply that the warrant requires the person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.

**ATTACHMENT C**

| _Code Section_ | _Offense Description_ |
| --- | --- |
| 18 U.S.C. §§ 111(a), 2 | Forcibly assaulting, resisting, opposing, impeding, intimidating, or interfering with any federal officer while that officer is engaged in or on account of the performance of official duties; aiding and abetting |
| 18 U.S.C. §§ 1512(c)(2), 2 | Corruptly obstructing, influencing , or impeding any official proceeding, or attempt to do so; aiding and abetting |
| 18 U.S.C. § 231(a)(3) | Committing or attempting to commit any act to obstruct, impede, or interfere with any fireman or law enforcement officer lawfully engaged in the lawful performance of his official duties incident to and during the commission of a civil disorder which in any way or degree obstructs, delays, or adversely affects commerce or the movement of any article or commodity in commerce or the conduct or performance of any federally protected function |
| 40 U.S.C. §§ 5104(e)(2)(D) and (F) | Disorderly and disruptive conduct and acts of physical violence on Capitol Grounds; aiding and abetting |

## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF:**<br>**10 DEWEY DRIVE, KETTERING, OHIO**<br>**45420**<br>**UNDER RULE 41** | **SW No.** 3:21-MJ-305 |

### AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41
### FOR A WARRANT TO SEARCH AND SEIZE

I, Task Force Officer Kyle G. Metz, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a warrant to search the premises known as **10 DEWEY DRIVE, KETTERING, OHIO 45420**, hereinafter "PREMISES," further described in Attachment A, for the things described in Attachment B.

2. I am a Task Force Officer with the Federal Bureau of Investigation. I have been assigned to the FBI as a Task Force Officer since January 2017. Currently, I am tasked with investigating criminal activity on the U.S. Capitol grounds on January 6, 2021. As a Task Force Officer, I am authorized by law or a Government agency to engage in or supervise the prevention, detention, investigation, or prosecution of violations of Federal criminal laws.

3. The facts in this affidavit come from my personal observations, my training and experience, and information obtained from other agents, witnesses, and agencies. This affidavit is

intended to show merely that there is sufficient probable cause for the requested warrant. It does not set forth all of my knowledge, or the knowledge of others, about this matter.

4. Based on my training and experience and the facts as set forth in this affidavit, I respectfully submit that there is probable cause to believe that violations of 18 U.S.C. §§ 111(a), 2 (Assaulting, Resisting, or Impeding, Certain Officers (Aiding and Abetting)), 18 U.S.C. § 1512(c)(2) (Obstruction of an Official Proceeding); 18 U.S.C. § 231(a)(3) (Civil Disorder); and 40 U.S.C. §§ 5104(e)(2)(D) and (F) (Disorderly Conduct and Physical Violence on Capitol Grounds) (the "Target Offenses")that have been committed by David MEHAFFIE ("the Subject") and other identified and unidentified persons, including others who may have been aided and abetted by, or conspiring with, the Subject, as well as others observed by the Subject. There is also probable cause to search the PREMISES, further described in Attachment A, for the things described in Attachment B.

## **PROBABLE CAUSE**

### *Background – The U.S. Capitol on January 6, 2021*

5. The United States Capitol Police ("USCP"), the FBI, and assisting law enforcement agencies are investigating a riot and related offenses that occurred at the United States Capitol Building, located at 1 First Street, NW, Washington, D.C., 20510 at latitude 38.88997 and longitude -77.00906 on January 6, 2021.

6. At the U.S. Capitol, the building itself has 540 rooms covering 175,170 square feet of ground, roughly four acres. The building is 751 feet long (roughly 228 meters) from north to south and 350 feet wide (106 meters) at its widest point. The U.S. Capitol Visitor Center is 580,000 square feet and is located underground on the east side of the Capitol. On the west side of the

2

Capitol building is the West Front, which includes the inaugural stage scaffolding, a variety of open concrete spaces, a fountain surrounded by a walkway, two broad staircases, and multiple terraces at each floor. On the East Front are three staircases, porticos on both the House and Senate side, and two large skylights into the Visitor's Center surrounded by a concrete parkway. All of this area was barricaded and off limits to the public on January 6, 2021.

7.     The U.S. Capitol is secured 24 hours a day by USCP. Restrictions around the U.S. Capitol include permanent and temporary security barriers and posts manned by USCP. Only authorized people with appropriate identification are allowed access inside the U.S. Capitol.

8.     On January 6, 2021, a joint session of the United States Congress was scheduled to convene at the U.S. Capitol to certify the vote count of the Electoral College of the 2020 Presidential Election, which took place on November 3, 2020 ("Certification"). The exterior plaza of the U.S. Capitol was closed to members of the public.

9.     A crowd began to assemble near the Capitol around 12:30 p.m. Eastern Standard Time (EST), and at about 12:50 p.m., known and unknown individuals broke through the police lines, toppled the outside barricades protecting the U.S. Capitol, and pushed past USCP and supporting law enforcement officers there to protect the U.S. Capitol.

10.     The joint session began at approximately 1:00 p.m. in the House Chamber.

11.     At approximately 1:30 p.m., the House and Senate adjourned to separate chambers to resolve a particular objection.  Vice President Mike Pence was present and presiding, first in the joint session, and then in the Senate chamber.  Also around this time, USCP ordered Congressional staff to evacuate the House Cannon Office Building and the Library of Congress James Madison Memorial Building, in part because of a suspicious package found nearby.  Pipe bombs were later

3

found near both the Democratic National Committee and Republican National Committee headquarters.

12.     As the proceedings continued in both the House and the Senate, USCP attempted to keep the crowd away from the Capitol building and the proceedings underway inside. Media reporting showed a group of individuals outside of the Capitol chanting, "Hang Mike Pence." I know from this investigation that some individuals believed that Vice President Pence possessed the ability to prevent the certification of the presidential election and that his failure to do so made him a traitor.

13.     At approximately 2:00 p.m., some people in the crowd forced their way through, up, and over additional barricades and law enforcement. The crowd advanced to the exterior façade of the building. The crowd was not lawfully authorized to enter or remain in the building and, prior to entering the building, no members of the crowd submitted to security screenings or weapons checks by USCP officers or other authorized security officials. At such time, the certification proceedings were still underway and the exterior doors and windows of the U.S. Capitol were locked or otherwise secured. Members of law enforcement attempted to maintain order and keep the crowd from entering the Capitol.

14.     At about 2:10 p.m., individuals in the crowd forced entry into the U.S. Capitol, including by breaking windows and by assaulting members of law enforcement, as others in the crowd encouraged and assisted those acts. Publicly available video footage shows an unknown individual saying to a crowd outside the Capitol building, "We're gonna fucking take this," which your affiant believes was a reference to "taking" the U.S. Capitol.

4



A Reporter's Footage from Inside the Capitol Siege

we're gonna fucking take this [indistinct].

1:16/12:32

15.     Shortly thereafter, at approximately 2:20 p.m. members of the United States House of Representatives and United States Senate, including the President of the Senate, Vice President Mike Pence, were instructed to—and did—evacuate the chambers.  That is, at or about this time, USCP ordered all nearby staff, Senators, and reporters into the Senate chamber and locked it down. USCP ordered a similar lockdown in the House chamber.  As rioters attempted to break into the House chamber, by breaking the windows on the chamber door, law enforcement were forced to draw their weapons to protect the victims sheltering inside.

16.     At approximately 2:30 p.m., known and unknown subjects broke windows and pushed past USCP and supporting law enforcement officers forcing their way into the U.S. Capitol on both the west side and the east side of the building.  Once inside, the subjects broke windows and doors, destroyed property, stole property, and assaulted federal police officers.  Many of the

5

federal police officers were injured and several were admitted to the hospital. The subjects also confronted and terrorized members of Congress, Congressional staff, and the media. The subjects carried weapons including tire irons, sledgehammers, bear spray, and tasers. They also took police equipment from overrun police including shields and police batons. At least one of the subjects carried a handgun with an extended magazine. These actions by the unknown individuals resulted in the disruption and ultimate delay of the vote Certification.

17.     Also at approximately 2:30 p.m., as subjects reached the rear door of the House Chamber, USCP ordered the evacuation of lawmakers, Vice President Mike Pence, and president pro tempore of the Senate, Charles Grassley, for their safety.

18.     At around 2:45 p.m., subjects broke into the office of House Speaker Nancy Pelosi. At about the same time, one subject was shot and killed while attempting to break into the House chamber through the broken windows.

19.     At around 2:47 p.m., subjects broke into the United States Senate Chamber. Publicly available video shows an individual asking, "Where are they?" as they opened up the door to the Senate Chamber. Based upon the context, law enforcement believes that the word "they" is in reference to members of Congress.



20.     After subjects forced entry into the Senate Chamber, publicly available video shows that an individual asked, "Where the fuck is Nancy?" Based upon other comments and the context, law enforcement believes that the "Nancy" being referenced was the Speaker of the House of Representatives, Nancy Pelosi.



21.    A subject left a note on the podium on the floor of the Senate Chamber. This note,

captured by the filming report, stated "A Matter of Time Justice is Coming."



22.     During the time when the subjects were inside the Capitol building, multiple subjects were observed inside the U.S. Capitol wearing what appears to be, based upon my training and experience, tactical vests and carrying flex cuffs. Based upon my knowledge, training, and experience, I know that flex cuffs are a manner of restraint that are designed to be carried in situations where a large number of individuals were expected to be taken into custody.





23.     At around 2:48 p.m. EST, D.C. Mayor Muriel Bowser announced a citywide curfew beginning at 6:00 p.m.

24.     At about 3:25 p.m. EST, law enforcement officers cleared the Senate floor.

25.     Between 3:25 p.m. EST and around 6:30 p.m. EST, law enforcement was able to clear the U.S. Capitol of all the subjects.

26.     Based on these events, all proceedings of the United States Congress, including the joint session, were effectively suspended until shortly after 8:00 p.m. EST the same day. In light of the dangerous circumstances caused by the unlawful entry to the U.S. Capitol, including the danger posed by individuals who had entered the U.S. Capitol without any security screenings or weapons check, Congressional proceedings could not resume until after every unauthorized occupant had left the U.S. Capitol, and the building had been confirmed secured. The proceedings resumed at approximately 8:00 p.m. EST, after the building had been secured. Vice President

Pence remained in the United States Capitol from the time he was evacuated from the Senate Chamber until the session resumed.

27.     Beginning around 8:00 p.m. EST, the Senate resumed work on the Certification.

28.     Beginning around 9:00 p.m. EST, the House resumed work on the Certification.

29.     Both chambers of Congress met and worked on the Certification within the Capitol building until approximately 3:00 a.m. EST on January 7, 2021.

**Cell Phone Usage at the Riot**

30.     During national news coverage of the aforementioned events, video footage which appeared to be captured on mobile devices of persons present on the scene depicted evidence of violations of local and federal law, including scores of individuals inside the U.S. Capitol building without authority to be there.

31.     Based on my training and experience, I know that it is common for individuals to carry and use their cell phones during large gatherings, such as the gathering that occurred in the area of the U.S. Capitol on January 6, 2021. Such phones are typically carried at such gatherings to allow individuals to capture photographs and video footage of the gatherings, to communicate with other individuals about the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

32.     Many subjects seen on news footage in the area of the U.S. Capitol were using a cell phone in some capacity. It appears that some subjects were recording and/or live streaming the events occurring in and around the U.S. Capitol and others appear to be taking photos, to include photos and video of themselves after breaking into the U.S Capitol itself and photos of

themselves damaging and stealing property. As reported in the news media, others inside and immediately outside the U.S. Capitol live-streamed their activities, including those described above as well as statements about these activities.

33. Photos below, available on various publicly available news, social media, and other media show some of the subjects within the U.S. Capitol during the riot. In several of these photos, the individuals who broke into the U.S. Capitol can be seen holding and using cell phones, including to take pictures and/or videos:





12

<hr />

1 https://losangeles.cbslocal.com/2021/01/06/congresswoman-capitol-building-takeover-an-attempted-coup/

2 https://www.businessinsider.com/republicans-objecting-to-electoral-votes-in-congress-live-updates-2021-1

13



***Conduct of David Mehaffie on January 6, 2021***

34.     In the afternoon of January 6, 2021, a group of individuals attempted to enter the

Capitol Building via the doors located at the Lower West Terrace ("LWT") of the building.  That

group began with a small number of individuals, including David Mehaffie ("the Subject"), but

later grew to include hundreds of individuals, many of whom carried makeshift weapons such as

flagpoles, batons, pepper spray, riot shields, and other everyday items that were then used against

law enforcement as the mob attempted to force entry into the building.  From approximately 2:40

p.m. to 5:15 p.m., many of those individuals combined and coordinated their efforts in an attempt

to force their way through the LWT entrance.

---

[3]https://www.thv11.com/article/news/arkansas-man-storms-capitol-pelosi/91-41abde60-a390-4a9e-b5f3-
d80b0b96141e

14

35.     Starting at approximately 2:40 p.m., U.S. Capitol Police ("USCP") and Metropolitan Police Department ("MPD") officers formed a police line at the LWT entrance to prevent the mob from entering the building through that entrance.  On January 6, 2021, the LWT was undergoing preparation for the inauguration of now-President Biden.  Scaffolding had been erected for the media, and stairs, risers, and other flooring was in place to create the stage area upon which the inauguration would take place.  In the center of the LWT is an archway with a short set of stairs that leads to a set of double doors with glass windows; those doors permit entrance directly into the Capitol Building.[4]  As the mob arrived at that entrance, law enforcement positioned themselves inside of the second set of doors, closest to the interior of the building.

36.     In a video obtained by law enforcement in the course of the riot investigation ("Video 1"), the Subject can be seen walking up the exterior terrace stairs and into the tunnel as part of the very first group of individuals to attempt to breach the Capitol through that entrance. In that video, the Subject is captured on camera from behind, walking up the stairs and into the tunnel.  As he walks up the stairs, his back is visible to the camera and he is wearing a light-grey "hoodie"-style sweatshirt.  The back of his head is also visible to the camera, showing short grey hair.

---

[4] Since January 6, 2021, this area has become colloquially known as "the tunnel."  On January 6, 2021, the stairs leading from the Capitol doors down to the Lower West Terrace had been covered by a platform so that the tunnel floor was flush.  At the entrance to the tunnel, stairs then led down to the Lower West Terrace itself.  In the past, President-elects, including now-President Biden, walked through the LWT entrance doors and the tunnel, and then down the stairs to the inauguration stage.

37.     Once inside of the tunnel, Video 1 depicts the Subject standing with his back to the camera, facing the first set of doors.  In that portion of the video, the glass windows in the first set of doors appear to be unbroken.  At the same time, MPD Sgt. 1 was standing on the other side of the glass doors, opposite of the Subject, as law enforcement prepared to defend the entrance from the incoming group of rioters.  Sgt. 1's Body Worn Camera (BWC) then captures the Subject at approximately 2:42 p.m. standing immediately outside of the first set of double doors, repeatedly using his fist to pound on the unbroken glass window.  The Subject's face is momentarily visible in the BWC of Sgt. 1, as is the front of his light-grey hoodie, which has a vertical zipper in the center.  Underneath his hoodie, the Subject is wearing a dark grey or black shirt, with a blue gaiter around his neck.  Moments later, another rioter, who is standing near the Subject, uses a makeshift weapon to break the glass window out of the door that the Subject had been pounding on.

38.     Once the glass is broken, Video 1 depicts another rioter yanking the first set of doors open and holding the door open as the Subject walks through.  The Subject is the very first rioter to walk through the first set of doors.  He then walks directly up to the second set of doors, opens the doors, and holds the door open for other rioters.  As the Subject opens the door, Video 1 shows a wall of USCP and MPD officers who have formed a human barricade to protect the entrance from being breached.  As the Subject holds the door open, other rioters begin attacking the USCP and MPD officers with their hands and with makeshift weapons, including flag poles.  As the first attack begins, a male voice can be heard saying "Don't hurt the police."  The camera does not clearly identify the speaker, but the Subject's hand can be seen raised in the air at the time the words are spoken.  Shortly thereafter, the Subject appears to fall into the front line of officers and is momentarily caught between the line of officers and the line of rioters.

16










39.     Surveillance video (CCTV) from the LWT tunnel confirmed that the Subject entered the tunnel and participated in the mob's activities on January 6, 2021. That CCTV footage, which includes timestamps, captured the Subject walking up the steps to the tunnel at 2:41 p.m. The Subject can then be seen moving forward in the tunnel, toward the first set of double doors, before disappearing from the view of the camera.[5]   The screenshot below captures the Subject entering the tunnel at approximately 2:41 p.m.

---

[5] The CCTV camera is located inside of the tunnel facing out toward the exterior terrace.  Due to the angle of this camera, it did not capture the space immediately in front of the first set of doors.



40.     Between 2:42 p.m. and 2:51 p.m., the Subject remained inside the tunnel, but out of the view of the camera.  At 2:51 p.m., CCTV footage again captured the Subject exiting the tunnel, making his way through the crowd and back toward the tunnel entrance.  As he walked through the crowd, he waved his arm in the air, as if to clear the crowd out of his way.

41.     When the Subject reached the tunnel entrance at approximately 2:52 p.m., he climbed up on a raised platform at the tunnel entrance, placing himself several feet above the other rioters in the tunnel.  From that elevated position, the Subject would have had a direct line of sight into the tunnel, allowing him to see the entire crowd in the tunnel as well as the police line barricading the entrance.  CCTV footage shows the Subject remaining in the elevated position from approximately 2:52 p.m. to 3:18 p.m. when the police forced the group of rioters out of the tunnel for a short period of time.  The screenshot below shows the Subject at approximately 2:52 p.m., shortly after climbing up to the elevated position at the archway.

19



42.     When the Subject initially climbed to the elevated archway position, he was wearing the light grey "hoodie"-style sweatshirt depicted above as an outer layer.   At approximately 2:58 p.m., CCTV captures him removing the outer light grey sweatshirt.  Once the light grey sweatshirt is removed, the Subject continued wearing the darker grey or black shirt that had previously been under the sweatshirt, with the blue gaiter around his neck.  He also appears to have light-in-color earphones or other similar item draped around his neck.  The earphone-like item is visible both before and after the Subject removes his sweatshirt.



43.     During the approximately 26 minutes that the Subject stood above the crowd of rioters, he helped to coordinate the mob's actions by attempting to organize and direct individuals in and around the tunnel.  CCTV shows the Subject repeatedly using his arms throughout that time period to direct the mob by waving, pointing, and gesturing to the crowd.  He can also be seen assisting members of the mob as they pass items back and forth in the tunnel, including riot shields stolen from law enforcement and later used by rioters against police officers.  The same CCTV also shows that the Subject appears to be speaking and shouting throughout that 26-minute period. The CCTV video available for review by the affiant to date does not include audio.

44.     During the time period from 2:52 p.m. to 3:18 p.m., while the Subject was standing in the elevated position at the tunnel archway, other members of the mob engaged in numerous assaults and acts of violence against law enforcement inside of the tunnel.  These acts include, but are not limited to:  spraying chemical agents such as pepper spray in the direction of the police

21

line; using hands and fists to strike in the direction of the police line; using flagpoles, batons, or similar items to strike in the direction of the police line; throwing numerous objects – including poles, bottles, plastic boxes, and even a firecracker – in the direction of the police line; spitting toward the police line; flashing a strobe light in the direction of the police line; and using stolen law enforcement shields to strike and push officers in the police line.

45.     On several occasions during that period, rioters in the tunnel would also amass their collective bodyweight and coordinate their efforts by repeatedly pushing as a group against the police line in an apparent effort to force their way through the line while collectively shouting "Heave ho!"  One such mass effort by the mob occurred inside of the tunnel at approximately 3:12 p.m.  Just prior to the mass push against the police line, the number of rioters in the tunnel had decreased, leaving vacant space in the tunnel.  CCTV shows that as the number of rioters in the tunnel decreased – thereby relieving pressure on the officers defending the entrance – the Subject began animatedly gesturing to rioters standing outside of the tunnel to move inside of the tunnel to fill in the vacant space.  Multiple individuals responded and quickly began entering the tunnel. As the vacant space began to fill with additional bodies, thereby increasing the amount of force and weight that could be collectively applied, the mob began to repeatedly push against the police line.  A similar scenario occurred again at approximately 3:15 p.m.  On this occasion, the number of rioters in the tunnel had again decreased, leaving vacant space between rioters.  The Subject again began gesturing to the crowd outside on the terrace to enter the tunnel.  Multiple rioters then moved inside of the tunnel, building up the force and weight that could be collectively applied against the line of officers.  Moments later, the mob again engaged in a mass push, using their collective body weight to attempt to force their way through the police line and into the building.

22

46.     At approximately 3:18 p.m., law enforcement successfully pushed the mob back out of the tunnel and out onto the terrace.  As officers pushed forward toward the tunnel entrance, the Subject remained in the elevated position at the archway as officers approached.  Several officers attempted to get the Subject down, but he physically resisted their efforts to move him. Only after multiple attempts by officers to force him from his position did the Subject finally step down onto the terrace.

47.     Open-source video posted following the January 6, 2021, riot, captures some of the Subject's words during the 26-minute period when he directed rioters while on the elevated platform at the archway.  In one video previously posted to You Tube with the title "Just Another Channel, Banned Video, Info Wars," the Subject is captured on video at multiple points as he is standing at the archway elevated above the crowd.  At one point, the Subject assists the crowd of rioters in passing a stolen police riot shield out of the tunnel and out onto the terrace.  As the Subject grabs the shield, he holds it high in the air while screaming "Yeah," as is shown in the screenshot below. The crowd cheers in response and the Subject hands the shield to another rioter on the terrace.



At a later point in the same video, the Subject is shown directing the crowd in and out of the tunnel. The video shows him raising his right hand in the air and loudly screaming "Hey!" to get the attention of the crowd standing near the tunnel entrance. He is then captured on video shouting to the crowd, "If you are going in, get on this side!" while pointing to the right side of the tunnel. He then shouts to the crowd, "In on this side, out on this side! In on this side, out on this side!" As he shouts, he points "in" toward the right side of the tunnel and gestures "out" on the left side of the tunnel. At least one member of the crowd responds to the Subject's direction and repeats the refrain "In on this side, out on that side."



48. The Subject is also captured in a second publicly available video, again coordinating with other rioters. In a video filmed by photojournalist Jon Farina, the Subject can be heard on video speaking to other rioters as they attempt to enter the tunnel. The Subject leans toward several individuals at the tunnel entrance saying, "Hey guys, listen. Hey, listen up! If you go further [indiscernible] they are squishing people. Stop there, then we will switch out."

25



49.     He then directs rioters to "Push, push!"  At the same time, a rioter inside of the tunnel violently strikes at the police line with a pole.  When another rioter throws a large yellow plastic box into the tunnel, the Subject yells "Don't throw shit guys. Don't hurt [indiscernible]." In the same video, after police remove the Subject from his elevated position, the Subject stands in the front of the archway and yells to the crowd "Sit down, sit down!"

50.     After being removed from his elevated position at the archway, the Subject remained at the tunnel entrance from approximately 3:19 p.m. to 3:50 p.m.  During that time period, the Subject stayed at the mouth of the tunnel as other rioters continued their efforts to push through the police line and to gain entrance into the building.

26

*Identification of David Mehaffie*

51.     Following January 6, 2021, the FBI opened an investigation into the individual described above.  As part of the investigation, on approximately January 14, 2021, the FBI issued a notice to the public designating that individual as "AFO #86," and requesting information from the public to help identify him.

52.     In response, a Confidential Human Source (CHS) using publicly available methods reported to the FBI that AFO #86 was possibly identifiable as "David Mehaffie" of Dayton, Ohio. The CHS additionally provided possible identifiers for AFO #86, including: (1) a possible address on Santa Cruz Ave, in Dayton, Ohio; (2) possible phone numbers of XXX-XXX-8528 and XXX-XXX-2557; (3) possible Facebook ID of 314593252648233; and (4) possible Instagram of @belmontgym.  The CHS also provided the FBI with additional links to social media related to the Subject and the January 6, 2021, riot.  The CHS is motivated by financial compensation and has provided reliable information to the FBI since March of 2016.

53.     Through a review of open-source and Ohio Business records, the FBI determined that "@belmontgym" was associated with the Belmont Gym (Belmont, Gym, LLC) in Dayton, Ohio, a company which is registered to a "Kymberly Mehaffie."  The address of the gym was provided as 630 Watervliet Avenue in Dayton, Ohio.  A review of the Belmont Gym Facebook page shows an image of the reported owner, the Subject.  The image on the Belmont Gym Facebook page was compared to the image of AFO #86 and reasonably appeared to be the same person.

54.     A review of law enforcement databases yielded possible addresses for David and Kymberly Mehaffie as: (1) an address on Santa Cruz Avenue in Dayton, Ohio; and (2) 10 Dewey

Drive in Kettering, Ohio. David and Kymberly Mehaffie hold themselves out as being married and surveillance later confirmed that they live at the Kettering, Ohio, address.

55.     David Mehaffie's driver's license currently lists his address as the residence on Santa Cruz Avenue, in Dayton, Ohio. However, public records show that the Santa Cruz Avenue residence was foreclosed on in 2019 and was purchased by a "Caleb Mehaffie" who is believed to be David Mehaffie's son. During surveillance conducted in May of 2021 at the Santa Cruz Avenue address, law enforcement did not observe either David Mehaffie or Kymberly Mehaffie at the residence.

56.     Kymberly Mehaffie's driver's license lists her residence as 10 Dewey Drive, in Kettering Ohio. A vehicle registered in Kymberly Mehaffie's name and bearing the Ohio license plate "GLE9269" is also associated with the address of 10 Dewey Drive. Between May 3, 2021 and May 21, 2021, law enforcement conducted surveillance at 10 Dewey Drive on a total of four separate days. On three of the four days in May of 2021, surveillance showed David Mehaffie leaving 10 Dewey Drive in a red pick-up truck with Ohio registration HMU5800 which is registered to a "James Mehaffie." Law enforcement also observed Kymberly Mehaffie's vehicle with license plate number "GLE9269" parked on the property on multiple occasions in May of 2021. In surveillance conducted on August 10, 2021, law enforcement again observed the vehicle with license plate number "GLE9269" parked on the property.

57.     A search of the Montgomery County Ohio Auditor's Office GIS mapping tool shows that 10 Dewey Drive is the front unit, with 12 Dewey Drive being to the rear. (Image below)



58.     A check of law enforcement records indicated that the address of 10 Dewey Drive is associated with Kymberly Mehaffie as of November 30, 2020.  The same records check also indicated that the address of 12 Dewey Drive is associated with other individuals who have no known connection to either David Mehaffie or Kymberly Mehaffie.

59.     A local law enforcement records check also produced the following telephone numbers for David and Kymberly Mehaffie as: (1) XXX-XXX-2557; and (2) XXX-XXX-1610. Legal process confirmed that both phone numbers are registered to an individual named "Kymberly Mehaffie" and that both phone numbers were in the location of the U.S. Capitol Building on January 6, 2021.

29

60.     On April 2, 2021, the affiant conducted surveillance at the Belmont Gym, located at 630 Watervliet Avenue in Dayton, Ohio.  A painted message on the front window of the business advertised the sale of gym equipment and the contact number listed for the equipment was XXX-XXX-2557, one of the phone numbers associated with the Subject.  An FBI Task Force Officer later attempted to make telephone contact using the number and reached a voicemail message.  A male voice on the message indicated that it was the Subject and a message was left asking about the gym equipment.

61.     On April 19, 2021, an FBI Task Force Officer went to the Belmont Gym to inquire about the gym equipment.  The Task Force Officer spoke with a male at the location who identified himself as "Dave."  A brief conversation took place, with the Task Force Officer never identifying his association to the FBI.  The Task Force Officer had previously viewed images of the Subject from the Capitol and confirmed that it appeared to be the same person.

62.     On May 24, 2021, the affiant, along with an FBI Special Agent, interviewed four possible witnesses who work in the vicinity of the Belmont Gym.  The four witnesses were interviewed separately and all four witnesses we shown identical images of AFO #86 taken in Washington, D.C. on January 6, 2021.  Each potential witness was then asked if they could identify the male individual in the images.

63.     The first person interviewed (hereinafter W-1) works on the same block as the Belmont Gym.  After viewing the images of AFO #86, W-1 said that it may have seen the male previously but was not sure who it was.  The second person, (hereinafter W-2), works one block from the Belmont Gym.  When asked if it could identify the male in the images, W-2 initially indicated that the male individual did not look familiar.  However, when the Belmont Gym was

mentioned, W-2 indicated that the male in the images "might" be David Mehaffie, but that they were not sure.

64. The third person interviewed (hereinafter W-3) works on the same block as the Belmont Gym. After viewing the images of AFO #86, W-3 pointed in the direction of the Belmont Gym and identified the individual as the owner of the gym. W-3 also indicated that the male in the images had a wife who W-3 believed owned "Mehaffie's Pies." "Mehaffie's Pies" is a well-known local pie shop located in Dayton, Ohio and is owned by an LLC. Law enforcement was unable to verify whether Kymberly Mehaffie has an ownership interest in the pie shop.

65. The fourth person interviewed (hereinafter W-4), works on the same block as the Belmont Gym. After viewing the images, W-4 identified the male in the photographs as "Dave Mehaffie." W-4 indicated that the male in the images was "for sure" the Subject and that it had "done business with" and talked with the Subject on many occasions.

66. Additional investigation determined that a License Plate Reader (LPR) in the Washington D.C. area captured an image of a vehicle bearing an Ohio License Plate of "GLE9269" on January 5, 2021. The vehicle was traveling northbound on North Lynn Street in Arlington, VA, over the Francis Scott Key Memorial Bridge on that date. The registered owner of that vehicle was determined to be Kymberly Mehaffie, with the listed address of 10 Dewey Drive, Kettering, Ohio. A vehicle bearing the license plate "GLE9269" was observed parked at the address of 10 Dewey Drive, Kettering, Ohio, multiple times in May of 2021 and again on August 10, 2021.

67. In addition to the investigation described above, the FBI also conducted other interviews and received tips from throughout the United States in response to the request for information regarding AFO #86. On March 25, 2021, a detective from the Dayton Police

31

Department who previously had contact with David and Kymberly Mehaffie was interviewed. The Detective was shown images from the Capitol believed to be the Subject but was unable to positively identify him. To date, the FBI has also received approximately 17 tips regarding AFO #86. One anonymous tip positively identified AFO #86 as "David Mehaffie" and explained that "[h]e and wife Kym Mehaffie are business owners in Dayton, Ohio…" Twelve additional tips provided images of AFO #86, with no additional information identifying the person in the images. The remaining four tips identified AFO #86 as someone other than the Subject. One tipster identified AFO #86 as a resident of Massachusetts. The driver's license photo of the Massachusetts resident was visually compared and determined not to be a match. Another tip identified AFO #86 as a resident of Washington state. The FBI identified four individuals from Washington state with the same name and, after a comparison with all four driver's license photos, determined that none were a match to AFO #86. Another tipster provided a name other than the Subject's, but later explained that he did not know the named individual and only reported this information to the FBI because social media directed this to be done. The tipster was not able to provide any additional information about the individual he claimed was AFO #86. Finally, a tipster identified AFO #86 as an individual who appears in a group photograph on social medial with the caption "Gays for trump! The more you hate, the bigger we grow. Come get us #Nashville." The tipster also provided a social medial profile for that individual. The FBI visually compared the group photograph and social media account to photographs of AFO #86 and determined that it was not the same person.

68. I know, based on my training and experience, that people routinely re-wear clothing and accessories and store these items in their homes. Clothing and accessories consistent with

those worn by David Mehaffie on January 6, 2021, constitute evidence of the commission of the offenses discussed herein, in that David Mehaffie can be visually identified as the individual in the photos and videos discussed above, in part through the distinct attire and accessories worn that day.

69.     As described above, there is evidence that digital devices associated with David Mehaffie and Kymberly Mehaffie were in the area of the U.S. Capitol on January 6, 2021 (*see* paragraph 59).  In addition, based on photos and videos of the offenses that date, numerous persons committing the Target Offenses possessed digital devices that they used to record and post photos and videos of themselves and others committing those offenses.  I also know, based on my training and experience, that cell phones are expensive, and people routinely retain their cell phones for many months or years.  Individuals often store their phone somewhere in their home while present at the residence.  Further, based on the investigation, numerous persons committing the Target Offenses possessed digital devices to communicate with other individuals to plan their attendance at the gatherings, to coordinate with other participants at the gatherings, and to post on social media and digital forums about the gatherings.

70.     Moreover, it is well-known that virtually all adults in the United States use mobile digital devices.  In a fact sheet from June 12, 2019, The Pew Research Center for Internet & Technology estimated that 96% of Americans owned at least one cellular phone, and that that same 2019 report estimated that 81% of Americans use at least one smartphone.  *See* Mobile Fact Sheet, https://www.pewresearch.org/internet/fact-sheet/mobile/ (last visited Jan. 9, 2021).

71.     Based on my training and experience, and on conversations I have had with other law enforcement officers, I know that some individuals who participate in activities aimed at

33

disrupting or interfering with governmental and/or law enforcement operations have been known to use anonymizing services and/or applications capable of encrypting communications to protect their identity and communications. By using such tools, in some cases, the only way to see the content of these conversations is on the electronic device that had been used to send or receive the communications.

72.    The property to be searched includes cellular phones along with accessories owned, used, or controlled by David or Kymberly Mehaffie, hereinafter the "Devices."

73.    Investigators have reason to believe that the Devices are currently located at 10 Dewey Drive, Kettering, Ohio 45420 because surveillance has identified that as David and Kymberly Mehaffie's residence.  Based on my training and experience, individuals keep their mobile devices on or around their person.  Vehicles owned by Kymberly Mehaffie were also spotted at the residence during surveillance in May of 2021, and again on August 10, 2021.

## **TECHNICAL TERMS**

74.    Based on my training and experience, and information acquired from other law enforcement officials with technical expertise, I know the terms described below have the following meanings or characteristics:

a.    "Digital device," as used herein, includes the following three terms and their respective definitions:

1)    A "computer" means an electronic, magnetic, optical, or other high speed data processing device performing logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. *See* 18 U.S.C. § 1030(e)(1).  Computers are physical units of equipment that perform information

34

processing using a binary system to represent information. Computers include, but are not limited to, desktop and laptop computers, smartphones, tablets, smartwatches, and binary data processing units used in the operation of other products like automobiles.

2) "Digital storage media," as used herein, means any information storage device in which information is preserved in binary form and includes electrical, optical, and magnetic digital storage devices. Examples of digital storage media include, but are not limited to, compact disks, digital versatile disks ("DVDs"), USB flash drives, flash memory cards, and internal and external hard drives.

3) "Computer hardware" means all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, modems, routers, scanners, and related communications devices such as cables and connections), as well as any devices, mechanisms, or parts that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

b. "Wireless telephone" (or mobile telephone, or cellular telephone), a type of digital device, is a handheld wireless device used for voice and data communication at least in part through radio signals and also often through "wi-fi" networks. When communicating via radio signals, these telephones send signals through networks of transmitters/receivers, enabling communication with other wireless telephones, traditional "land line" telephones, computers, and

35

other digital devices. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of applications and capabilities. These include, variously: storing names and phone numbers in electronic "address books"; sending, receiving, and storing text messages, e-mail, and other forms of messaging; taking, sending, receiving, and storing still photographs and video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; utilizing global positioning system ("GPS") locating and tracking technology, and accessing and downloading information from the Internet.

      c.     A "tablet" is a mobile computer, typically larger than a wireless phone yet smaller than a notebook, that is primarily operated by touchscreen. Like wireless phones, tablets function as wireless communication devices and can be used to access the Internet or other wired or wireless devices through cellular networks, "wi-fi" networks, or otherwise. Tablets typically contain programs called applications ("apps"), which, like programs on both wireless phones, as described above, and personal computers, perform many different functions and save data associated with those functions.

      d.     A "GPS" navigation device, including certain wireless phones and tablets, uses the Global Positioning System ("GPS") to display its current location, and often retains records of its historical locations. Some GPS navigation devices can give a user driving or walking directions to another location and may contain records of the addresses or locations involved in such historical navigation. The GPS consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a

36

mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

       e.    "Computer passwords and data security devices" means information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates as a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

       f.    "Computer software" means digital information which can be interpreted by a computer and any of its related components to direct the way they work. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

       g.    Internet Protocol ("IP") Address is a unique numeric address used by digital devices on the Internet. An IP address, for present purposes, looks like a series of four numbers, each in the range 0-255, separated by periods (*e.g.*, 149.101.1.32). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that

37

computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

h.     The "Internet" is a global network of computers and other electronic devices that communicate with each other using numerous specified protocols. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

i.     "Internet Service Providers," or "ISPs," are entities that provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer a range of options in providing access to the Internet, including via telephone-based dial-up and broadband access via digital subscriber line ("DSL"), cable, dedicated circuits, fiber-optic, or satellite. ISPs typically charge a fee based upon the type of connection and volume of data, called bandwidth, which the connection supports. Many ISPs assign each subscriber an account name, a username or screen name, an e-mail address, an e-mail mailbox, and a personal password selected by the subscriber. By using a modem, the subscriber can establish communication with an ISP and access the Internet by using his or her account name and password.

j.     A "modem" translates signals for physical transmission to and from the ISP, which then sends and receives the information to and from other computers connected to the Internet.

38

k.     A "router" often serves as a wireless Internet access point for one or multiple devices and directs traffic between computers connected to a network (whether by wire or wirelessly).  A router connected to the Internet collects traffic bound for the Internet from its client machines and sends out requests on their behalf.  The router also distributes to the relevant client inbound traffic arriving from the Internet.  A router usually retains logs for any devices using that router for Internet connectivity.  Routers, in turn, are typically connected to a modem.

l.     "Domain Name" means the common, easy-to-remember names associated with an IP address.  For example, a domain name of "www.usdoj.gov" refers to the IP address of 149.101.1.32.  Domain names are typically strings of alphanumeric characters, with each level delimited by a period.  Each level, read backwards – from right to left – further identifies parts of an organization.  Examples of first-level, or top-level domains are typically .com for commercial organizations, .gov for the governmental organizations, .org for organizations, and .edu for educational organizations.  Second-level names will further identify the organization, for example usdoj.gov further identifies the United States governmental agency to be the Department of Justice.  Additional levels may exist as needed until each machine is uniquely identifiable.  For example, www.usdoj.gov identifies the World Wide Web server located at the United States Department of Justice, which is part of the United States government.

m.     "Cache" means the text, image, and graphic files sent to and temporarily stored by a user's computer from a website accessed by the user in order to allow the user speedier access to and interaction with that website in the future.

n.     "Peer to Peer file sharing" (P2P) is a method of communication available to Internet users through the use of special software, which may be downloaded from the Internet.

39

In general, P2P software allows a user to share files on a computer with other computer users running compatible P2P software. A user may obtain files by opening the P2P software on the user's computer and searching for files that are currently being shared on the network. A P2P file transfer is assisted by reference to the IP addresses of computers on the network: an IP address identifies the location of each P2P computer and makes it possible for data to be transferred between computers. One aspect of P2P file sharing is that multiple files may be downloaded at the same time. Another aspect of P2P file sharing is that, when downloading a file, portions of that file may come from multiple other users on the network to facilitate faster downloading.

     i.    When a user wishes to share a file, the user adds the file to shared library files (either by downloading a file from another user or by copying any file into the shared directory), and the file's hash value is recorded by the P2P software. The hash value is independent of the file name; that is, any change in the name of the file will not change the hash value.

     ii.    Third party software is available to identify the IP address of a P2P computer that is sending a file. Such software monitors and logs Internet and local network traffic.

     o.    "VPN" means a virtual private network. A VPN extends a private network across public networks like the Internet. It enables a host computer to send and receive data across shared or public networks as if they were an integral part of a private network with all the functionality, security, and management policies of the private network. This is done by establishing a virtual point-to-point connection through the use of dedicated connections, encryption, or a combination of the two. The VPN connection across the Internet is technically a

40

wide area network (WAN) link between the sites. From a user perspective, the extended network resources are accessed in the same way as resources available from a private network-hence the name "virtual private network." The communication between two VPN endpoints is encrypted and usually cannot be intercepted by law enforcement.

p. "Encryption" is the process of encoding messages or information in such a way that eavesdroppers or hackers cannot read it but authorized parties can. In an encryption scheme, the message or information, referred to as plaintext, is encrypted using an encryption algorithm, turning it into an unreadable ciphertext. This is usually done with the use of an encryption key, which specifies how the message is to be encoded. Any unintended party that can see the ciphertext should not be able to determine anything about the original message. An authorized party, however, could decode the ciphertext using a decryption algorithm that usually requires a secret decryption key, to which adversaries do not have access.

q. "Malware," short for malicious (or malevolent) software, is software used or programmed by attackers to disrupt computer operations, gather sensitive information, or gain access to private computer systems. It can appear in the form of code, scripts, active content, and other software. Malware is a general term used to refer to a variety of forms of hostile or intrusive software.

## COMPUTERS, ELECTRONIC/MAGNETIC STORAGE, AND FORENSIC ANALYSIS

75. As described above and in Attachment B, this application seeks permission to search for evidence, fruits, contraband, instrumentalities, and information that might be found on the PREMISES, in whatever form they are found. One form in which such items might be found is data stored on one or more digital devices. Such devices are defined above and include any

electronic system or device capable of storing or processing data in digital form, including central processing units; desktop computers, laptop computers, notebooks, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; peripheral input/output devices, such as keyboards, printers, scanners, plotters, monitors, and drives intended for removable media; related communications devices, such as modems, routers, cables, and connections; storage media, such as hard disk drives, floppy disks, USB flash drives, memory cards, optical disks, and magnetic tapes used to store digital data (excluding analog tapes such as VHS); and security devices. Thus, the warrant applied for would authorize the seizure of digital devices or, potentially, the copying of stored information, all under Rule 41(e)(2)(B). Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit that, if digital devices are found on the PREMISES, there is probable cause to believe that the items described in Attachment B will be stored in the Device(s) for at least the following reasons:

a. Individuals who engage in the foregoing criminal activity/Target Offenses, including posting content on the YouTube channel youtube.com/c/i70show, recording the events of January 6, 2021 at or near the U.S. Capitol, recordings of event leading up to and the events of January 6, 2021, communications with co-conspirators online and through electronic messaging in relation to the events of January 6, 2021; to access websites to facilitate illegal activity and to communicate with co-conspirators online; to store on digital devices, like the Device(s), documents and records relating to their illegal activity, which can include logs of online chats with co-conspirators; email correspondence; text or other "Short Message Service" ("SMS") messages;

42

and contact information of co-conspirators, including telephone numbers, email addresses, identifiers for instant messaging and social medial accounts.

b. Individuals who engage in the foregoing criminal activity, in the event that they change digital devices, will often "back up" or transfer files from their old digital devices to that of their new digital devices, so as not to lose data, including that described in the foregoing paragraph, which would be valuable in facilitating their criminal activity.

c. Digital device files, or remnants of such files, can be recovered months or even many years after they have been downloaded onto the medium or device, deleted, or viewed via the Internet. Electronic files downloaded to a digital device can be stored for years at little or no cost. Even when such files have been deleted, they can be recovered months or years later using readily available forensics tools. When a person "deletes" a file on a digital device such as a home computer, a smart phone, or a memory card, the data contained in the file does not actually disappear; rather, that data remains on the storage medium and within the device unless and until it is overwritten by new data. Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space – that is, in space on the digital device that is not allocated to an active file or that is unused after a file has been allocated to a set block of storage space – for long periods of time before they are overwritten. In addition, a digital device's operating system may also keep a record of deleted data in a "swap" or "recovery" file. Similarly, files that have been viewed via the Internet are automatically downloaded into a temporary Internet directory or "cache." The browser typically maintains a fixed amount of electronic storage medium space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve "residue" of an electronic file from a digital device depends

43

less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer, smart phone, or other digital device habits.

76.     As further described in Attachment B, this application seeks permission to locate not only electronic evidence or information that might serve as direct evidence of the crimes described in this affidavit, but also for forensic electronic evidence or information that establishes how the digital device(s) were used, the purpose of their use, who used them (or did not), and when.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I respectfully submit there is probable cause to believe that this forensic electronic evidence and information will be in any of the Device(s) at issue here because:

        a.      Although some of the records called for by this warrant might be found in the form of user-generated documents or records (such as word processing, picture, movie, or texting files), digital devices can contain other forms of electronic evidence as well.  In particular, records of how a digital device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials contained on the digital device(s) are, as described further in the attachments, called for by this warrant.  Those records will not always be found in digital data that is neatly segregable from the hard drive, flash drive, memory card, or other electronic storage media image as a whole.  Digital data stored in the Device(s), not currently associated with any file, can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).  Virtual memory paging systems can leave digital data on a hard drive that show what tasks and processes

44

on a digital device were recently used. Web browsers, e-mail programs, and chat programs often store configuration data on a hard drive, flash drive, memory card, or memory chip that can reveal information such as online nicknames and passwords. Operating systems can record additional data, such as the attachment of peripherals, the attachment of USB flash storage devices, and the times a computer, smart phone, or other digital device was in use. Computer, smart phone, and other digital device file systems can record data about the dates files were created and the sequence in which they were created. This data can be evidence of a crime, indicate the identity of the user of the digital device, or point toward the existence of evidence in other locations. Recovery of this data requires specialized tools and a controlled laboratory environment, and also can require substantial time.

        b.     Forensic evidence on a digital device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, registry information, configuration files, user profiles, e-mail, e-mail address books, chats, instant messaging logs, photographs, the presence or absence of malware, and correspondence (and the data associated with the foregoing, such as file creation and last-accessed dates) may be evidence of who used or controlled the digital device at a relevant time, and potentially who did not.

        c.     A person with appropriate familiarity with how a digital device works can, after examining this forensic evidence in its proper context, draw conclusions about how such digital devices were used, the purpose of their use, who used them, and when.

        d.     The process of identifying the exact files, blocks, registry entries, logs, or other forms of forensic evidence on a digital device that are necessary to draw an accurate

conclusion is a dynamic process. While it is possible to specify in advance the records to be sought, digital device evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on digital devices is evidence may depend on other information stored on the devices and the application of knowledge about how the devices behave. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

    e.  Further, in finding evidence of how a digital device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on the device. For example, the presence or absence of counter-forensic programs, anti-virus programs (and associated data), and malware may be relevant to establishing the user's intent and the identity of the user.

## <u>METHODS TO BE USED TO SEARCH DIGITAL DEVICES</u>

  77.  Based on my knowledge, training, and experience, as well as information related to me by agents and others involved in this investigation and in the forensic examination of digital devices, I know that:

    a.  Searching digital devices can be an extremely technical process, often requiring specific expertise, specialized equipment, and substantial amounts of time, in part because there are so many types of digital devices and software programs in use today. Digital devices – whether, for example, desktop computers, mobile devices, or portable storage devices – may be customized with a vast array of software applications, each generating a particular form of information or records and each often-requiring unique forensic tools, techniques, and expertise. As a result, it may be necessary to consult with specially trained personnel who have specific

expertise in the types of digital devices, operating systems, or software applications that are being searched, and to obtain specialized hardware and software solutions to meet the needs of a particular forensic analysis.

b. Digital data is particularly vulnerable to inadvertent or intentional modification or destruction. Searching digital devices can require the use of precise, scientific procedures that are designed to maintain the integrity of digital data and to recover "hidden," erased, compressed, encrypted, or password-protected data. Recovery of "residue" of electronic files from digital devices also requires specialized tools and often substantial time. As a result, a controlled environment, such as a law enforcement laboratory or similar facility, is often essential to conducting a complete and accurate analysis of data stored on digital devices.

c. Further, as discussed above, evidence of how a digital device has been used, the purposes for which it has been used, and who has used it, may be reflected in the absence of data on a digital device. For example, to rebut a claim that the owner of a digital device was not responsible for a particular use because the device was being controlled remotely by malicious software, it may be necessary to show that malicious software that allows someone else to control the digital device remotely is not present on the digital device. Evidence of the absence of data or software on a digital device is not segregable from the digital device itself. Analysis of the digital device as a whole to demonstrate the absence of particular data or software requires specialized tools and a controlled laboratory environment and can require substantial time.

d. Digital device users can attempt to conceal data within digital devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can

47

easily change the extension to ".txt" to conceal the image and make it appear as though the file contains text. Digital device users can also attempt to conceal data by using encryption, which means that a password or device, such as a "dongle" or "keycard," is necessary to decrypt the data into readable form. Digital device users may encode communications or files, including substituting innocuous terms for incriminating terms or deliberately misspelling words, thereby thwarting "keyword" search techniques and necessitating continuous modification of keyword terms. Moreover, certain file formats, like portable document format ("PDF"), do not lend themselves to keyword searches. Some applications for computers, smart phones, and other digital devices, do not store data as searchable text; rather, the data is saved in a proprietary non-text format. Documents printed by a computer, even if the document was never saved to the hard drive, are recoverable by forensic examiners but not discoverable by keyword searches because the printed document is stored by the computer as a graphic image and not as text. In addition, digital device users can conceal data within another seemingly unrelated and innocuous file in a process called "steganography." For example, by using steganography, a digital device user can conceal text in an image file that cannot be viewed when the image file is opened. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. A substantial amount of time is necessary to extract and sort through data that is concealed, encrypted, or subject to booby traps, to determine whether it is evidence, contraband, or instrumentalities of a crime.

       e.    Analyzing the contents of mobile devices, including tablets, can be very labor intensive and also requires special technical skills, equipment, and software. The large, and ever increasing, number and variety of available mobile device applications generate unique forms

of data, in different formats, and user information, all of which present formidable and sometimes novel forensic challenges to investigators that cannot be anticipated before examination of the device. Additionally, most smart phones and other mobile devices require passwords for access. For example, even older iPhone 4 models, running IOS 7, deployed a type of sophisticated encryption known as "AES-256 encryption" to secure and encrypt the operating system and application data, which could only be bypassed with a numeric passcode. Newer cell phones employ equally sophisticated encryption along with alpha-numeric passcodes, rendering most smart phones inaccessible without highly sophisticated forensic tools and techniques, or assistance from the phone manufacturer. Mobile devices used by individuals engaged in criminal activity are often further protected and encrypted by one or more third party applications, of which there are many. For example, one such mobile application, "Hide It Pro," disguises itself as an audio application, allows users to hide pictures and documents, and offers the same sophisticated AES-256 encryption for all data stored within the database in the mobile device.

        f. Based on all of the foregoing, I respectfully submit that searching any digital device for the information, records, or evidence pursuant to this warrant may require a wide array of electronic data analysis techniques and may take weeks or months to complete. Any pre-defined search protocol would only inevitably result in over- or under-inclusive searches, and misdirected time and effort, as forensic examiners encounter technological and user-created challenges, content, and software applications that cannot be anticipated in advance of the forensic examination of the devices. In light of these difficulties, your affiant requests permission to use whatever data analysis techniques reasonably appear to be necessary to locate and retrieve digital information, records, or evidence within the scope of this warrant.

78. The volume of data stored on many digital devices will typically be so large that it will be extremely impractical to search for data during the physical search of the premises.

a. Therefore, in searching for information, records, or evidence, further described in Attachment B, law enforcement personnel executing this search warrant will employ the following procedures:

1. Upon securing the PREMISES, law enforcement personnel will, consistent with Rule 41(e)(2)(B) of the Federal Rules of Criminal Procedure, seize any digital devices (that is, the Device(s)), within the scope of this warrant as defined above, deemed capable of containing the information, records, or evidence described in Attachment B and transport these items to an appropriate law enforcement laboratory or similar facility for review. For all the reasons described above, it would not be feasible to conduct a complete, safe, and appropriate search of any such digital devices at the PREMISES. The digital devices, and/or any digital images thereof created by law enforcement sometimes with the aid of a technical expert, in an appropriate setting, in aid of the examination and review, will be examined and reviewed in order to extract and seize the information, records, or evidence described in Attachment B.

2. The analysis of the contents of the digital devices may entail any or all of various forensic techniques as circumstances warrant. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); conducting a file-by-file review by "opening," reviewing, or reading the images or first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data;

50

scanning storage areas for deliberately hidden files; and performing electronic "keyword" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to the subject matter of the investigation.

3.     In searching the digital devices, the forensic examiners may examine as much of the contents of the digital devices as deemed necessary to make a determination as to whether the contents fall within the items to be seized as set forth in Attachment B. In addition, the forensic examiners may search for and attempt to recover "deleted," "hidden," or encrypted data to determine whether the contents fall within the items to be seized as described in Attachment B. Any search techniques or protocols used in searching the contents of the seized digital devices will be specifically chosen to identify the specific items to be seized under this warrant.

## BIOMETRIC ACCESS TO DEVICE(S)

79.     This warrant permits law enforcement agents to obtain from the person of **David Mehaffie** (but not any other individuals present at the PREMISES at the time of execution of the warrant) the compelled display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any Device(s) requiring such biometric access subject to seizure pursuant to this warrant for which law enforcement has reasonable suspicion that the aforementioned person(s)' physical biometric characteristics will unlock the Device(s). The grounds for this request are as follows:

80.     I know from my training and experience, as well as from information found in publicly available materials published by device manufacturers, that many electronic devices, particularly newer mobile devices and laptops, offer their users the ability to unlock the device

through biometric features in lieu of a numeric or alphanumeric passcode or password.  These biometric features include fingerprint scanners, facial recognition features, and iris recognition features.  Some devices offer a combination of these biometric features, and the user of such devices can select which features they would like to utilize.

81.     If a device is equipped with a fingerprint scanner, a user may enable the ability to unlock the device through his or her fingerprints.  For example, Apple offers a feature called "Touch ID," which allows a user to register up to five fingerprints that can unlock a device.  Once a fingerprint is registered, a user can unlock the device by pressing the relevant finger to the device's Touch ID sensor, which is found in the round button (often referred to as the "home" button) located at the bottom center of the front of the device.  The fingerprint sensors found on devices produced by other manufacturers have different names but operate similarly to Touch ID.

82.     If a device is equipped with a facial-recognition feature, a user may enable the ability to unlock the device through his or her face.  For example, this feature is available on certain Android devices and is called "Trusted Face."  During the Trusted Face registration process, the user holds the device in front of his or her face.  The device's front-facing camera then analyzes and records data based on the user's facial characteristics.  The device can then be unlocked if the front-facing camera detects a face with characteristics that match those of the registered face.  Facial recognition features found on devices produced by other manufacturers (such as Apple's "Face ID") have different names but operate similarly to Trusted Face.

83.     If a device is equipped with an iris-recognition feature, a user may enable the ability to unlock the device with his or her irises.  For example, on certain Microsoft devices, this feature is called "Windows Hello."  During the Windows Hello registration, a user registers his or her

52

irises by holding the device in front of his or her face. The device then directs an infrared light toward the user's face and activates an infrared-sensitive camera to record data based on patterns within the user's irises. The device can then be unlocked if the infrared-sensitive camera detects the registered irises. Iris-recognition features found on devices produced by other manufacturers have different names but operate similarly to Windows Hello.

84.     In my training and experience, users of electronic devices often enable the aforementioned biometric features because they are considered to be a more convenient way to unlock a device than by entering a numeric or alphanumeric passcode or password. Moreover, in some instances, biometric features are considered to be a more secure way to protect a device's contents. This is particularly true when the users of a device are engaged in criminal activities and thus have a heightened concern about securing the contents of a device.

85.     As discussed in this Affidavit, your Affiant has reason to believe that one or more digital devices will be found during the search. The passcode or password that would unlock the Device(s) subject to search under this warrant currently is not known to law enforcement. Thus, law enforcement personnel may not otherwise be able to access the data contained within the Device(s), making the use of biometric features necessary to the execution of the search authorized by this warrant.

86.     I also know from my training and experience, as well as from information found in publicly available materials including those published by device manufacturers, that biometric features will not unlock a device in some circumstances even if such features are enabled. This can occur when a device has been restarted, inactive, or has not been unlocked for a certain period of time. For example, Apple devices cannot be unlocked using Touch ID when: (1) more than 48

53

hours has elapsed since the device was last unlocked; or, (2) when the device has not been unlocked using a fingerprint for 8 hours and the passcode or password has not been entered in the last 6 days. Similarly, certain Android devices cannot be unlocked with Trusted Face if the device has remained inactive for four hours. Biometric features from other brands carry similar restrictions. Thus, in the event law enforcement personnel encounter a locked device equipped with biometric features, the opportunity to unlock the device through a biometric feature may exist for only a short time.

87.     Due to the foregoing, if law enforcement personnel encounter any Device(s) that are subject to seizure pursuant to this warrant and may be unlocked using one of the aforementioned biometric features, this warrant permits law enforcement personnel to obtain from the aforementioned person(s) the display of any physical biometric characteristics (such as fingerprint/thumbprint or facial characteristics) necessary to unlock any Device(s), including to (1) press or swipe the fingers (including thumbs) of the aforementioned person(s) to the fingerprint scanner of the Device(s) found at the PREMISES; (2) hold the Device(s) found at the PREMISES in front of the face of the aforementioned person(s) to activate the facial recognition feature; and/or (3) hold the Device(s) found at the PREMISES in front of the face of the aforementioned person(s) to activate the iris recognition feature, for the purpose of attempting to unlock the Device(s) in order to search the contents as authorized by this warrant.

88.     The proposed warrant does not authorize law enforcement to require that the aforementioned person(s) state or otherwise provide the password, or identify specific biometric characteristics (including the unique finger(s) or other physical features) that may be used to unlock or access the Device(s). Nor does the proposed warrant authorize law enforcement to use

the fact that the warrant allows law enforcement to obtain the display of any biometric characteristics to compel the aforementioned person(s) to state or otherwise provide that information. However, the voluntary disclosure of such information by the aforementioned person(s) would be permitted under the proposed warrant. To avoid confusion on that point, if agents in executing the warrant ask any of the aforementioned person(s) for the password to any Device(s), or to identify which biometric characteristic (including the unique finger(s) or other physical features) unlocks any Device(s), the agents will not state or otherwise imply that the warrant requires the person to provide such information, and will make clear that providing any such information is voluntary and that the person is free to refuse the request.

89.     Law enforcement personnel will commence the execution of this search and seizure warrant upon the PREMISES during daytime hours (between 6:00 a.m. and 10:00 p.m.), as early as practicable. It is anticipated that law enforcement personnel will attempt to image or copy digital information from certain servers on the PREMISES, rather than remove those servers from the premises. Such onsite imaging or copying will minimize disruptions to the use of those servers.

90.     From my training and experience, I know that imaging or copying information from servers on the PREMISES can be substantially delayed by various factors which cannot be ascertained or sometimes even anticipated until the actual execution of the warrant. There may, for example, be no system administrator available, willing, or able to assist law enforcement personnel to narrow the search by identifying the virtual or dedicated server(s) on the PREMISES, or the server folders, containing information within the scope of the warrant. There may be terabytes or even petabytes of information to be copied. The network architecture of the servers on the PREMISES or the configuration of the server hardware may affect and delay data transfer

55

speeds. Data encryption and password protections may also significantly delay imaging or copying as law enforcement personnel seek to identify necessary passwords without which imaging or copying on the PREMISES would likely be unachievable. Under some circumstances, data downloads can be interrupted by network or hardware malfunctions or other network or hardware attributes which often necessitates restarting the data downloads from the beginning.

91. For all of the foregoing reasons, I respectfully submit that good cause exists, pursuant to Fed. R. Crim. P. 41(e)(2)(A)(ii), for authorization to execute the search warrant at any time of the day or night. Law enforcement personnel will commence executing the warrant as near to 6:00 a.m. as practicable. However, given the myriad factors that that may prevent completion of the search and seizure by 10:00 p.m., including those described above, I request authorization to continue the warrant execution past 10:00 p.m., if necessary, until completion of the warrant execution. Suspending the execution at 10:00 p.m. until 6:00 a.m. could compromise data downloads in progress, render stored data subject to alteration or deletion, require securing the PREMISES during the intervening hours, and prolong the disruption of access to, and use of, the PREMISES and the digital devices being searched.

## CONCLUSION

92.     I submit that this affidavit supports probable cause for a warrant to search the

PREMISES described in Attachment A and to seize the items described in Attachment B.

Respectfully submitted,

**Kyle G. Metz**
Task Force Officer
**Federal Bureau of Investigation**

Subscribed and sworn before me via telephone pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on
**August 11, 2021**

Peter B. Silvain, Jr.
United States Magistrate Judge

57